[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-15640
Non-Argument Calendar
_____

D.C. Docket No. 1:15-tp-20027-CMA-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

OSCAR GOMEZ,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(February 13, 2017)

Before ED CARNES, Chief Judge, MARCUS and ROSENBAUM, Circuit Judges.

PER CURIAM:

After approximately four grams of cocaine were found in Oscar Gomez's tractor-trailer, a district court ordered revocation of his supervised release. This is his appeal.

## I.

In 2013 Gomez pleaded guilty to conspiracy to commit money laundering, a violation of 18 U.S.C. § 1956. His sentence included three years of supervised release following his term of imprisonment. While out on supervised release, Gomez was arrested for possession of cocaine. As a result, a United States Probation Officer petitioned the district court to revoke Gomez's supervised release.

At the revocation hearing the government called one witness: the arresting officer, Sergeant Brandon Goldman of the Madison County, Florida, Sheriff's Office.[1] Goldman testified that he pulled over Gomez on June 22, 2016, while Gomez was driving a tractor-trailer. Goldman checked Gomez's logbook — in which Gomez was supposed to record every use of his truck — and noticed that the logbook had no entries for the previous thirteen days, raising his suspicion. Goldman also ran Gomez's information through a police database, discovering that Gomez was out on supervised release. As Goldman asked Gomez questions about the logbook and his supervised release status, Gomez's face "became very stern

---

[1] Goldman was also referred to as a sheriff's deputy at the revocation hearing, but he testified that he held the rank of sergeant.

2

and kind of shocked in a sense," further increasing Goldman's level of suspicion. Based on that suspicion, Goldman asked for consent to search the truck, and Gomez consented.[2]

Goldman testified that he, along with other sheriff's deputies who arrived later, searched the "sleeper berth" part of the trailer. Their search of the berth revealed several packages of a white powdery substance, hidden inside a cigarette pack, hidden inside a box of Cocoa Puffs. The cigarette pack had been placed at the bottom of the box, beneath the unopened plastic-wrapped cereal. After finding the white powdery substance, Goldman arrested Gomez, and Gomez said "you know, people use cocaine to stay awake." A field test later revealed that the substance consisted of about four grams of cocaine, with a street value of $400. The government did not present the cocaine, the cigarette pack, or the box of Cocoa Puffs at the hearing.

After the government rested, Gomez called his own sole witness: his wife Diana Gomez. Mrs. Gomez testified that Gomez bought the truck on May 20, 2016, thirty-three days before he was arrested. As Gomez's counsel presented a series of photographs of the sleeper berth, Mrs. Gomez explained its layout. The berth had two bunk beds; underneath the bottom bunk was a storage area that could

---

[2] The government also played footage from Goldman's body camera that showed his interactions with Gomez leading up to the search so that the district court could observe Gomez's demeanor during the stop.

3

be accessed by lifting the bunk's mattress.  The cocaine was found in that storage area.  Pictures of the storage area showed that it contained several documents that were dated from 2014 to 2015 — at least a year before Gomez began driving the truck.  Those documents referred to companies and drivers that had no connection to Gomez.  Mrs. Gomez also stated that other items in the storage space, like a shirt and a hammer, did not belong to her husband.  Photographs of the sleeper berth showed that Gomez's possessions, such as an Xbox and his clothes, were kept outside the storage area.  On cross-examination, Mrs. Gomez stated that when Gomez was not driving the truck, it was parked in a secure lot.

After Mrs. Gomez finished her testimony and the parties made closing arguments, the district court found that the government had carried its burden and revoked Gomez's supervised release.  It found that the "perishable" nature of the Cocoa Puffs (in contrast to the other items in the storage space), Gomez's dominion and control of the truck for over thirty days before the cocaine was found, and the fact that he had organized the contents of the berth were sufficient to show that the cocaine belonged to Gomez.  The district court sentenced Gomez to six months imprisonment and another twenty-seven months of supervised release after that.

## II.

Gomez contends that the district court erred in finding that he violated the terms of his supervised release, and it should not have revoked his supervised release on that basis. "We review the district court's conclusion that [Gomez] violated the terms of his supervised release for abuse of discretion." United States v. Copeland, 20 F.3d 412, 413 (11th Cir. 1994). That standard "allows a range of choice for the district court, so long as that choice does not constitute a clear error of judgment." United States v. Irey, 612 F.3d 1160, 1189 (11th Cir. 2010) (en banc). A district court may "revoke a term of supervised release, and require the defendant to serve in prison all or part of the term of supervised release" if the court "finds by a preponderance of the evidence that the defendant violated a condition of supervised release." 18 U.S.C. § 3583(e)(3). A condition of Gomez's supervised release was that he not possess a controlled substance.

At the revocation hearing the government showed that Gomez had exclusive dominion and control of the vehicle in which the cocaine was discovered. That is enough to prove that he had "constructive possession" of the cocaine. See United States v. Leonard, 138 F.3d 906, 909 (11th Cir. 1998) ("Constructive possession exists when a defendant has . . . dominion or control over the premises or the vehicle in which the object is concealed.").

5

It is true that a pre-Gomez driver could have left the cocaine in the storage space. But as the government pointed out at the hearing, the substantial street value of the cocaine — $400 according to Goldman — makes it much less likely that someone would simply leave it behind. That same fact distinguishes the cocaine from the other items in the space that supposedly belonged to other drivers — there is no indication that a hammer, an old shirt, and some out of date trucking documents could be worth anywhere near $400. The government was not required to rebut alternative explanations for the cocaine's presence beyond a reasonable doubt; it had to show only that it was more likely than not that the cocaine belonged to Gomez.[3] It was not a clear error in judgment to find that the government met that burden, so we cannot say that the district court abused its discretion.

**AFFIRMED.**

---

[3] In addition, the district court could have determined that Gomez's nervousness during the traffic stop, as captured by Goldman's body camera, suggested that he knew that he had contraband in the truck. Cf. United States v. Dominguez, 226 F.3d 1235, 1247 (11th Cir. 2000) (holding that a district court's credibility determination about a witness before the district court was not clear error because "the district court is in a better position to evaluate credibility"). Likewise, the district court was better placed to determine whether any self-serving exculpatory statements Gomez made after his arrest were credible.

6